**Gregory T. BANNER, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–708 L.

United States Court of Federal Claims.

Sept. 4, 1997.

plaintiffs do not meet the criteria for class certification and therefore denies plaintiffs' motion to certify.

## FACTS

In the mid-nineteenth century, settlers occupied land on the Allegany Reservation of the Seneca Nation of New York Indians (Nation) pursuant to land leases with the Nation. The Nation, however, lacked the authority to lease lands. Thus, Congress enacted the Act of February 19, 1875, ch. 90, 18 Stat. 330 (hereinafter "1875 Act"), which authorized the Nation to lease land within the Cattaraugus and Allegany Reservations, and confirmed the existing leases. The 1875 Act gave the Nation federal authorization to lease the lands for five years with an option to renew for up to 12 years. In 1890, Congress passed a similar act which extended the renewal period to a 99–year maximum term. The leases renewed under the Act of September 3, 1890, ch. 1132, 26 Stat. 558 (hereinafter "1890 Act"), expired February 19, 1991.

In anticipation of the lease expiration in 1991, the State of New York established the Salamanca Indian Lease Authority (SILA). SILA's stated purpose was to represent the lessees and negotiate a "master lease" between the City of Salamanca (City) and the Nation. The City would lease the properties from the Nation and would in turn sublease to the individual lessees. SILA obtained individual authorization from a majority of lessees to negotiate with the Nation, but had no authority to actually accept or reject a lease. Although the master lease never materialized, negotiations between SILA and the Nation continued.

In July 1990, the Nation and the City of Salamanca negotiated an agreement (the Agreement) that proposed terms for interim leases. These interim leases provided for a forty-year term with a forty-year renewal option (40/40 leases). Each 40/40 lease calculated rent based on fair market value of the land, rather than the value of the land and improvements. The total annual rental payment due from the lessees was set at $800,-000 to be collected from the lessees, and paid

Jennifer A. Coleman, Buffalo, NY, for plaintiffs.

Margaret M. Sweeney, Washington, DC, for defendant, with whom was David Moran, U.S. Department of the Interior, of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge.

This action is brought by twenty individual plaintiffs and the Salamanca Coalition of United Taxpayers (SCOUT), a corporate plaintiff, seeking takings compensation under the Fifth Amendment. The complaint alleges that the enactment and enforcement of the Seneca Nation Settlement Act of 1990, 25 U.S.C. § 1774 (1994) (hereinafter "1990 Act"), constitutes a taking of plaintiffs' property under the Fifth Amendment of the United States Constitution. Plaintiffs' current motion, which defendant opposes, is to certify as a class pursuant to Rule 23 of the United States Court of Federal Claims (RCFC 23). As discussed below, the court finds that

by the City. The lease also allowed the parties to maintain claims pertaining to the interpretation of the Acts of 1875 and 1890. This included the Nation's claim to possession of improvements on the leased lands.

The majority of the lessees refused to sign the 40/40 lease. Instead, on November 2, 1990, approximately 350–400 lessees requested a renewal for another 99–year term and arbitration pursuant to the 1875 Act. Shortly thereafter, the Seneca Nation Settlement Act of 1990, 25 U.S.C. § 1774 (1994) (hereinafter "1990 Act"), was enacted. The 1990 Act mandated the payment to the Nation of $35,-000,000 by the federal government, 25 U.S.C. § 1774d(b), and $25,000,000 by the State of New York, 25 U.S.C. § 1774d(c). These provisions for payment mirror provisions in the Agreement.[1] Agreement Between the Seneca Nation of Indians and the City of Salamanca, Complaint Ex. D, pp. 13–14. The 1990 Act conditioned these payments on the Nation's offer of new leases in accordance with the Agreement, and the Nation's extinguishment of certain claims for payment of rent against the United States, the State of New York, the City, the congressional villages, and all prior lessees. 25 U.S.C. § 1774b(b)-(c).

The Nation refused to accept the lessees' request for a 99–year renewal and insisted that the 40/40 lease be signed. In December 1990, the lessees instigated a suit in district court against the Nation, SILA, the City of Salamanca and others to compel the 99–year lease renewal and/or an arbitration procedure pursuant to the Act of 1875. The district court dismissed the claim based on the Nation's sovereign immunity. The Second Circuit affirmed and in *dicta* stated that even if the Nation had waived its sovereign immunity, the court would have affirmed on the ground that "[t]he 1875 Act does not authorize a perpetual renewal, and without clear language to that effect, we will not construe the statute to confer such a right." *Fluent v. Salamanca Indian Lease Authority*, 928 F.2d 542, 546 (2d Cir.), *cert. denied*, 502 U.S. 818, 112 S.Ct. 74, 116 L.Ed.2d 48 (1991)

(citations omitted). Only after the Supreme Court denied certiorari, did the majority of the lessees sign the 40/40 leases.

The twenty individual plaintiffs in this case purchased property in and around the City of Salamanca, New York, in reliance on land leases with the Nation. These individuals refused to sign the 40/40 lease, and consequently, they are also defendants in a trespass and ejectment suit brought by the United States in the District Court for the Western District of New York. The last named plaintiff, SCOUT, represents the 2300 lessees who signed the 40/40 lease.

Pursuant to the Fifth Amendment of the Constitution, plaintiffs claim the enactment and enforcement of the 1990 Act constitutes a taking of private property without just compensation and without due process. Plaintiffs argue that the Settlement Act of 1990 effectively extinguished the 99–year leases and any renewal interest. They also assert that the 1990 Act caused the Nation to take possession of the improvements on the leased land.

This order arises from plaintiffs' RCFC 23 motion to certify class action, filed November 4, 1996. Plaintiffs contend that each individual plaintiff is similarly situated and maintains a common legal question typical to the group, enabling them to certify as a class pursuant to RCFC 23. For the reasons discussed below, the court denies plaintiffs' motion.

## DISCUSSION

Although RCFC 23 is similar to Rule 23 of the Federal Rules of Civil Procedure, there are several differences in the criteria and application used to determine class certification. *Abel v. United States*, 18 Cl.Ct. 477, 478 (1989) (noting an eight-part test is used in this court as opposed to the four-part test under the FRCP). RCFC 23 provides:

A motion to certify a class action shall be filed with the complaint and comply with Rule 3(c), with service to be made as provided in Rule 4. The court shall determine

---

1. The Agreement's condition of payment by the federal government and by the State of New York approximated the difference between fair market value and the rents actually received by the Nation over the prior 99 years.

in each case whether a class action may be maintained and under what terms and conditions.

R. U.S. CT. FED. CLS. 23.

The rule offers minimal guidance for the court in considering class certification. However, the U.S. Court of Claims, predecessor to the U.S. Court of Appeals to the Federal Circuit, created substantive and procedural guidelines for determining whether certification of a class is warranted. *Quinault Allottee Ass'n v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (1972) (clarifying class certification by establishing an eight-part test); *see also Cooke v. United States,* 1 Cl.Ct. 695, 697–98 (1983) (explaining unique characteristics of this court including opt-in approach and exclusive jurisdiction). "The court in *Quinault* set forth eight conjunctive criteria for proper certification, all of which must be met." *Black v. United States,* 24 Cl.Ct. 471, 477 (1991); *see also Buchan v. United States,* 27 Fed.Cl. 222, 224 (1992). The eight criteria are as follows: (1) the class must be large and manageable; (2) there must be a question of law common to the whole class; (3) the common question of law must predominate over any separate factual issues affecting individual class members; (4) the claims of named plaintiffs must be typical of the class; (5) the Government must have acted on grounds generally applicable to the whole class; (6) the claims must be so small that it is doubtful they would otherwise be pursued; (7) the named plaintiffs must adequately and fairly protect the interests of the class without conflicts of interest; (8) the prosecution of individual lawsuits must create a risk of inconsistent or varying adjudications. *Quinault,* 453 F.2d at 1276.

■ In applying this test, it is noteworthy that the Court of Federal Claims generally disfavors class action suits and considers certification of a class only in extraordinary circumstances. *Buchan v. United States,* 27 Fed.Cl. 222 (1992); *Black v. United States,* 24 Cl.Ct. 471 (1991); *O'Hanlon v. United States,* 7 Cl.Ct. 204 (1985). "The court should therefore be reluctant to certify a class unless it is convinced that to do so would serve the interests of justice." *Cooke v. United States,* 1 Cl.Ct. at 698; *see also*

*Kominers v. United States,* 3 Cl.Ct. 684, 686 (1983) (voicing skepticism of class action certification absent extraordinary circumstances).

■ Applying the *Quinault* test to the present facts, plaintiffs argue that all eight prongs have been satisfied and that a class action should be certified in the interests of efficiency. The court disagrees. Defendant correctly asserts that several factors make class action certification inappropriate in this instance. Specifically, the court finds that plaintiffs fail to satisfy prongs three, six, seven and eight.

The third prong requires a common legal question that predominates over separate factual issues affecting individual class members. Plaintiffs correctly assert that the core legal issue applicable to all plaintiffs is whether the terms of the Agreement ratified by the 1990 Act constitute a taking of their property rights. Thus, the court finds a question of law common to the group. However, plaintiffs fail to convince the court that this legal issue overrides individual issues of fact. Factual commonality is more determinative than legal commonality when considering class certification because factual issues are generally difficult and expensive to litigate, whereas legal issues may be resolved quickly and inexpensively through motions in a single case. *Cooke,* 1 Cl.Ct. at 698.

■ In determining whether a takings claim will succeed, the court must consider: (1) whether there is a compensable property right, and (2) whether the government action constituted a taking of that right. Plaintiff's ownership of a property interest is essential. *See Applegate v. United States,* 35 Fed.Cl. 406, 413 (1996). Furthermore, when analyzing the government action, three factors must be addressed: (a) the nature of the action; (b) the economic impact on claimant; and (c) the extent of interference with investment-backed expectations. *M & J Coal v. United States,* 30 Fed.Cl. 360, 366 (1994), *aff'd,* 47 F.3d 1148 (Fed.Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995). "The question of whether a taking has occurred is frequently fact-intensive, requiring the development of a com-

plete record through trial." *Id.* (allowing summary judgment but noting that takings claims require substantial consideration of facts). Thus, class certification in cases involving takings claims presents significant issues as to whether legal issues can override factual issues.

In the present case, the above takings analysis cannot be applied uniformly to all members of the proposed class because plaintiffs are not similarly situated. There is no property interest in the expectation that a lease will be renewed. *Applegate*, 35 Fed.Cl. at 420 (citing *Deltona Corp. v. United States*, 228 Ct.Cl. 476, 490–91, 657 F.2d 1184 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982)); *United States v. Petty Motor Co.*, 327 U.S. 372, 380 n. 9, 66 S.Ct. 596, 601 n. 9, 90 L.Ed. 729 (1946). Thus, plaintiffs fall into two groups relying on different facts to trigger their legal claims. The group that signed the renewal maintained their property interests and also preserved issues pertaining to the interpretation of the Acts of 1875 and 1890. The second group refused to sign the renewal leases and, thereby, allowed their leases to expire. These plaintiffs refused to vacate the property after the leases expired and are now defendants in a trespass and ejectment suit. By allowing their leases to expire, this second group may have lost their property interests. In order to prove a compensable property interest, the second group will need to prove facts very different from the facts relied upon by those who signed the 40/40 lease. These substantial factual differences among the plaintiffs will overshadow the court's takings analysis and defeat the purpose of class action certification. Thus, although a common legal issue exists in the present case, it is overridden by factual issues that may alter the court's legal holding.

■ The sixth, seventh, and eighth requirements listed in *Quinault* are additional obstacles to class certification. In analyzing the sixth factor, the court must determine whether it would be likely for the claims to be pursued if not for the class action. When evaluating whether plaintiffs will pursue litigation individually, one factor the court looks to is the size of the claim. Here, the amount of individual recovery is not small in relation to the costs of litigation. In fact, plaintiffs are seeking damages totaling approximately $115,000,000. Assuming that 2300 members join the class and that relief is dispersed equally, potential compensation per member would be $50,000, an amount sufficient to expect individual litigation. However, plaintiffs allege that it is intimidating to bring suit individually because they risk property vandalism, thus making it unlikely that individual suits will be brought. The court does not find this argument persuasive. There is no guarantee of safety in numbers. Intimidation may be present even if plaintiffs pursue their claims as a class.

■ The seventh *Quinault* requirement, addressing whether the named plaintiffs will fairly and adequately represent the interests of the class without conflict, is not sufficiently fulfilled in this instance. Defendant asserts that a potential conflict of interest exists among the class members because, as stated above, the factual claims of those who refused to sign the renewal must be argued on different grounds than the claims of those who signed. The court agrees. If plaintiffs were certified as a class, individual takings arguments may be precluded to the extent that the claims of those who refused to sign would not adequately represent the claims of those who did sign, or vice versa. In light of this potential conflict, the court concludes that the seventh prong is not satisfied.

■ The eighth prong pertains to the risk of inconsistent adjudications. In general, this risk is low in the Court of Federal Claims because, under the "Little Tucker Act", the court has exclusive jurisdiction over takings cases claiming more than $10,000. 28 U.S.C. § 1346(a)(2) (1994); *see Mitchell v. United States*, 930 F.2d 893, 894 n. 2 (Fed. Cir.1991) (requiring plaintiff to waive recovery of monies in excess of $10,000 to maintain district court jurisdiction under the Little Tucker Act); *Wildman v. United States*, 28 Fed.Cl. 494, 495–96 (1993) (stating that "a plaintiff may not bring a civil suit under the Little Tucker Act against the United States in federal district court if that claim exceeds $10,000"). In the present case, as stated above, plaintiffs seek damages in the amount

of approximately $50,000 per person. As a result, each plaintiff's claim should exceed this court's threshold for exclusive jurisdiction, barring action in another court. Thus, there is no risk of inconsistent adjudication.

## CONCLUSION

For the foregoing reasons, the court finds that plaintiffs have not met the requirements for class certification as set forth in RCFC 23 and *Quinault.* Therefore, the court denies plaintiffs' motion for class certification.

**IT IS SO ORDERED.**